**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 18-50-DLB-CJS**

**JEFFREY GUILKEY**                                                    **PLAINTIFF**


**v.**                          **MEMORANDUM OPINION AND ORDER**


**COMMERCIAL TRUCK & VAN EQUIPMENT, INC., et al.**         **DEFENDANTS**

* * * * * * * * * * * * * *

This is a personal injury case removed from Campbell Circuit Court. (Doc. # 1). Plaintiff Jeffrey Guilkey alleges that the truck he was cleaning at a car dealership had a defective tailgate that failed to support his weight, causing him to fall and suffer serious injuries. (Doc. # 53 at 5). Guilkey sued Omaha Standard, LLC, the manufacturer of the tailgate, as well as Commercial Truck & Van Equipment, Inc. ("Commercial"), which assembled the truck, bringing claims for products liability, negligence, and breach of warranty. (*Id.* at 6-12). Defendants have separately moved for summary judgment as to all claims. (Docs. # 96 and 97). Guilkey has abandoned his breach of warranty claims, (Docs. # 103 at 15 and 104 at 17), but has cross-moved for summary judgment on his products liability and negligence claims, (Doc. # 108).

Because a reasonable jury could conclude that the tailgate was defective and, furthermore, that Commercial was negligent in either assembling the truck or in failing to discover the defect, Commercial's Motion for Summary Judgment is **denied in relevant part**. However, Plaintiff has failed to demonstrate a genuine issue of fact that the tailgate

was defective when it left Omaha Standard's possession three years prior to the accident. Omaha Standard's Motion for Summary Judgment is accordingly **granted**. Finally, as disputes of fact exist regarding the cause of Plaintiff's fall, Plaintiff's cross-Motions for Summary Judgment are **denied**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jeffrey Guilkey was employed as a lot technician for Jeff Wyler, a Chrysler dealership in Fort Thomas, Kentucky.  (Doc. # 53 at 4).  On March 1, 2017, Guilkey was cleaning a Dodge Ram 5500 commercial pickup truck when he fell off the back of the truck bed, breaking his wrists and elbow and tearing his biceps muscle.  (Docs. # 97-11 at 3 and 108-13 at 2).  Guilkey alleges that the tailgate of the truck collapsed, causing him to fall.  (Docs. # 53 at 5 and 97-2 at 6).

The truck's tailgate is part of what is known as a general service body that was manufactured by Defendant Omaha Standard and sold to Defendant Commercial in May 2014.  (Docs. # 96-6 and 96-7).  Commercial stored the service body for nearly three years until Wyler needed a truck, at which point Commercial installed the service body onto a chassis (base frame) that was manufactured by Chrysler.  (Docs. # 96-8 at 5 and 104-11 at 2).  The assembly process involved lifting the service body with a crane, setting it onto the frame, bolting and welding it, and attaching a hitch.  (Doc. # 104-10 at 7).  Once completed, the truck was delivered to Wyler on February 27, 2017, (Doc. # 96-8 at 8), and then sold by Wyler to Enterprise Fleet Management, (Doc. # 97-1 at 5).  The truck was sold again soon thereafter to a company called Bansal Construction.  (Doc. # 97-1 at 4-6).

In February 2018, Guilkey sued Commercial and Chrysler (the manufacturer of the chassis) in Campbell Circuit Court.  (Doc. # 1-3 at 8).  Commercial removed the case to this Court in March 2018.  (Doc. # 1).  Chrysler was later dismissed from the litigation.  (Doc. # 45).  In the operative Second Amended Complaint, Guilkey names Commercial and Omaha Standard as defendants and brings claims of (1) strict liability, (2) breach of express warranty, (3) breach of implied warranty of fitness, (4) breach of implied warranty of merchantability, (5) negligence, and (6) punitive damages.  (Doc. # 53 at 6-12).  Along with its Answer to the Second Amended Complaint, Commercial brought a cross-claim against Omaha Standard for apportionment of fault under Ky. Rev. Stat. § 411.182.  (Doc. # 56 at 11-13).

At the conclusion of discovery, Commercial and Omaha Standard moved for summary judgment as to all Guilkey's claims, (Docs. # 96 and 97), and Guilkey cross-moved for summary judgment on his strict liability and negligence claims.  (Doc. # 108).  In addition, Omaha Standard moved to exclude the testimony of Guilkey's expert, Clinton Channell.  (Doc. # 109).  These Motions have been fully briefed (*see* Docs. # 103, 104, 107, 110, 111, 112, 113, 114, 115, and 116), and are now ripe for the Court's review.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "moving party bears the burden of

showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once a party files a properly-supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id*. at 252.

The Court must "accept [the non-moving party's] evidence as true and draw all reasonable inferences in his favor." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255). The Court may not "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Id*. (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52). If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

## B. Commercial's Motion for Summary Judgment on Guilkey's Strict Liability Claim

Commercial is not entitled to summary judgment on Guilkey's strict liability claim because triable issues of fact exist regarding whether the tailgate on the service body was defective at the time Commercial sold and delivered it to Wyler. Kentucky law "imposes strict liability on one who sells any product in a defective condition unreasonably

4

dangerous to the user or consumer, even though the seller has exercised all possible care in the preparation and sale of the products." *Niehoff v. Surgidev Corp.*, 950 S.W.2d 816, 822 (Ky. 1997). To prevail on a theory of strict products liability in Kentucky, a plaintiff must show that a product (1) "was not manufactured or assembled in accordance with its specifications" and (2) that the product defect caused his injuries. *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005) (applying Kentucky law).

Plaintiff has demonstrated a material issue of fact regarding whether the tailgate was defective. Although Guilkey lacks direct evidence of a defect, he may prove his manufacturing defect claim solely through circumstantial evidence. *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970). There is ample circumstantial evidence indicating that the tailgate malfunctioned when it collapsed underneath Guilkey, causing him to fall to the ground. Three of Guilkey's colleagues nearby that day testified unequivocally that they heard a loud banging sound immediately prior to Guilkey's fall and saw the tailgate in the "down" position after his fall, indicating that the tailgate had collapsed and smacked the back of the truck. (Docs. # 104-3 at 2-3, 6, 104-4 at 2-3, and 104-5 at 3-4). Although none of these individuals saw Guilkey fall, they all attributed the sound they heard to the tailgate's impact against the truck rather than to Guilkey's body hitting the ground. (Docs. # 104-3 at 3, 104-4 at 3, and 104-5 at 3-4). In addition, according to Wyler employee Darren Matlock, who came to Guilkey's aid shortly after his fall, Guilkey pointed in the direction of the tailgate and stated that it "f-ing collapsed on him." (Doc. # 104-3 at 4).

A reasonable jury could also find that the defective tailgate was the legal cause of Guilkey's injuries. The tailgate that allegedly collapsed had not been in use since it was manufactured by Omaha Standard, thereby largely ruling out the possibility that the

tailgate failed due to misuse or wear and tear.  *See Perkins v. Trailco Mfg. & Sales Co.*, 613 S.W.2d 855, 858 (Ky. 1981) (holding that a malfunction in a new product constitutes circumstantial evidence of the existence of a defect).  In addition, Commercial maintained exclusive control of the service body for almost three years prior to the accident and delivered the truck to Wyler a mere two days before the accident occurred.  This evidence suggests that the alleged defect existed when Commercial placed the service body into the stream of commerce.

Commercial noticeably does not attempt to explain how the tailgate would have collapsed absent a defect.  Commercial instead proposes an alternative explanation for Guilkey's fall.  It surmises that Guilkey put the tailgate down so that it would be easier to climb in and out of the truck and then fell off when he misjudged the distance to the end of the service body.  (Doc. # 97 at 7).  This theory is supported by the testimony of Wyler employee Dustin McClenithan, who remembered Guilkey saying that he had been walking backwards on the bed of the truck right before his fall.  (Doc. # 97-12 at 4).

However, as mentioned, three employees, including McClenithan, testified that they heard the tailgate smack against the truck as Guilkey fell to the ground.  Furthermore, another employee at the scene testified that he saw the tailgate on Guilkey's truck in the "up" position shortly before the accident.  (Doc. # 104-5 at 3).  Thus, while Commercial's theory is plausible, a jury could find that it is more likely than not that the accident was caused by a defect in the tailgate.  Nothing more is required of Guilkey at the summary judgment stage; a plaintiff need not eliminate all other possible causes of his injuries so long as a jury could reasonably conclude that a defect was the probable cause.  *See Schall v. Suzuki Motor of Am.*, 450 F. Supp. 3d 771, 785 (W.D. Ky. 2020); *Low v. Lowe's*

*Home Ctrs., Inc.*, 771 F. Supp. 2d 739, 744 (E.D. Ky. 2011); *cf. Perkins v. Hausladen*, 828 S.W.2d 652, 656 (Ky. 1992).

Commercial is mistaken in arguing that because Guilkey has not identified a specific defect in the tailgate, "Guilkey's theory that a defective tailgate caused his injuries is based solely on speculation and conjecture." (Doc. # 97 at 7). As the Sixth Circuit noted in *Siegel v. Dynamic Cooking Systems*, "a plaintiff . . . can prove a product liability claim using the fact of the malfunction if she eliminates those causes for which the manufacturer would not be liable." 501 F. App'x 397, 401 (6th Cir. 2012) (applying Kentucky law). Guilkey has done so here because there is sufficient evidence to conclude that the accident was caused by a defect in the tailgate rather than by an external cause, such as Guilkey's error. Kentucky law imposes strict liability on "one who sells any product in a defective condition unreasonably dangerous to the user or consumer." *Niehoff*, 950 S.W.2d at 822. "A plaintiff is not required to show precisely *how* a product is defective, but simply must show *whether* it was defective." *Siegel*, 501 F. App'x at 401.

For example, in *Perkins*, the plaintiff's dump truck trailer crashed to the ground during use, causing the load it was carrying to spill. 613 S.W.2d at 857. The Kentucky Supreme Court held that while there was no direct proof of any particular defect in the trailer, the circumstantial evidence of the trailer's malfunction was sufficient given that the plaintiff had eliminated possible external causes of the trailer's failure, including misuse or abuse by the operator. *Id.* at 858.

Furthermore, contrary to Commercial's contention, it cannot benefit from the limitation of liability for middlemen in Ky. Rev. Stat. § 411.340.[1] That statute provides that

---

[1]     Section 411.340 reads in full as follows:

"a wholesaler, distributor, or retailer who distributes or sells a product" is not liable in a products liability action if (1) "the manufacturer is identified and subject to the jurisdiction of the court" and (2) the product is sold by the intermediary "in its original manufactured condition."  Ky. Rev. Stat. § 411.340.  The first requirement of the statute is met here, as the manufacturer of the service body (Omaha Standard) is a defendant in this litigation and thus "subject to the jurisdiction of the court."

Commercial submits that it meets the second requirement in the statute because it technically sold the service body to Wyler in its original manufactured condition prior to assembly and, subsequent to the sale, assumed the role of a service contractor when it painted and installed the service body for Wyler.  (Doc. # 110 at 3).  This argument stretches the statute too far.  The contract providing for the sale of the service body to Wyler included payment for "Labor, Installation," (Doc. # 1-3 at 22), and Commercial maintained possession of the service body until it presented the fully assembled truck to Wyler on February 27, 2017, (Doc. # 96-8 at 8).  A reasonable jury could conclude from these facts that Commercial's sale of the service body was contingent on its painting and installation and, therefore, that the service body was not sold in its original condition.

Even assuming that Commercial executed a completed "sale" of the service body prior to installing and painting it, the middleman statute would still not apply because the

_____

In any product liability action, if the manufacturer is identified and subject to the jurisdiction of the court, a wholesaler, distributor, or retailer who distributes or sells a product, upon his showing by a preponderance of the evidence that said product was sold by him in its original manufactured condition or package, or in the same condition such product was in when received by said wholesaler, distributor or retailer, shall not be liable to the plaintiff for damages arising solely from the distribution or sale of such product, unless such wholesaler, distributor or retailer, breached an express warranty or knew or should have known at the time of distribution or sale of such product that the product was in a defective condition, unreasonably dangerous to the user or consumer.

statute refers to "a wholesaler, distributor, or retailer who *distributes* or sells a product" in its original manufactured condition.   Ky. Rev. Stat. § 411.340 (emphasis added). "Distribute" means "to give out or deliver especially to members of a group."   *Webster's Third New International Dictionary* 660 (1986); *accord The American Heritage Dictionary* 383 (1976) (defining "distribute" as "to deliver or pass out").   Commercial arguably "distributed" the service body only *after* it was altered by delivering the assembled truck to Wyler, thus placing its conduct outside the scope of the middleman statute.

This conclusion is in line with the limited purpose of the middleman statute "to protect those who merely sell the products."   *Parker v. Henry A. Petter Supply Co.*, 165 S.W.3d 474, 477 (Ky. Ct. App. 2005).  Commercial has not identified a case where a court afforded middleman status to a seller who changed a product's condition contemporaneously with its distribution.   In fact, at least one court has rejected a distributor's middleman defense where the evidence showed that the buyer had requested modifications to the product prior to delivery.  *See Franke v. Ford Motor Co.*, 398 F. Supp.2d 833, 841 (W.D. Ky. 2005).

The middleman statute requires that the distributor "show[] by a preponderance of the evidence that said product was sold by him in its original manufactured condition," Ky. Rev. Stat. § 411.340, thereby placing the burden on the distributor to demonstrate that the statute applies.  *See Smith v. Leveelift, Inc.*, No. 3:04-02-JMH, 2005 WL 2465821, at *2 (E.D. Ky. Oct. 6, 2005); *Koby v. Star Ammunition, Inc.*, No. 3:97-cv-96-S, 2001 U.S. Dist. LEXIS 24310, at *6-7 (W.D. Ky. Dec. 19, 2001).  A reasonable jury could conclude that Commercial has failed to meet its burden.

As triable issues of fact remain regarding whether Commercial sold or distributed a defective product not in its original condition, Commercial's Motion for Summary Judgment on Guilkey's products liability claim is **denied**.

### C. Commercial's Motion for Summary Judgment on Guilkey's Negligence Claims

For many of the reasons already stated, a reasonable jury could also find that Commercial was negligent.   Under Kentucky law, an injured party may assert both products liability and negligence claims against manufacturers and suppliers of products. *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985).   In addition to his products liability claim discussed above, Guilkey appears to assert two related negligence claims: first, that Commercial negligently installed the service body when it assembled the truck, and second, that Commercial unreasonably failed to detect a defect in the service body prior to delivering it to Wyler.  (*See* Docs. # 53 at 11 and 104 at 14).

To make out a claim of negligence, the plaintiff must show "(1) a duty on the part of the defendant; (2) a breach of that duty; and (3) consequent injury."  *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992).  While products liability and negligence claims have different elements, "[t]he foundation of both theories is that the product is 'unreasonably dangerous.'"  *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003) (quoting *Ulrich v. Kasco Abrasives Co.*, 532 S.W.2d 197, 200 (Ky. 1976)).  Similarly, both types of claims require a showing of causation, i.e., that the unreasonably dangerous condition was a "substantial factor" in bringing about the injury. *See Perkins*, 613 S.W.2d at 857; *Bailey v. N. Am. Refractories Co.*, 95 S.W.3d 868, 871 (Ky. Ct. App. 2001).

As discussed above with respect to Guilkey's products liability claim, material issues of fact remain as to whether the tailgate's unreasonably dangerous condition caused Guilkey's injuries.  Guilkey has thus met his burden on the causation aspect of his negligence claims.  In addition, the parties do not dispute that Commercial owed Guilkey a duty of reasonable care.  Accordingly, the remaining issue to be decided on Guilkey's negligence claims is whether there is a material issue of fact concerning Commercial's alleged breach of its duty.

A reasonable jury could infer a breach of duty based on the evidence presented above that the tailgate collapsed under Guilkey's weight shortly after Commercial installed it.  Such circumstantial evidence, frequently termed *res ipsa loquitur*, allows a jury to "reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it."[2]  *Love v. Walker*, 423 S.W.3d 751, 756 (Ky. 2014) (quoting *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010)).  In *Chesapeake & Ohio Railway Company v. Biliter*, for example, the Kentucky Court of Appeals (then Kentucky's highest court) applied the *res ipsa loquitur* doctrine where the tracks underneath a freight train the decedent was riding gave way, causing the railcar to topple into a river.  413 S.W.2d 894, 896 (Ky. 1967).  The *Biliter* court held that this evidence on its own permitted an inference that the railroad defendant had failed to reasonably inspect its tracks.  *Id.* Just as "railroad trains ordinarily do not fall into rivers," *id.*, tailgates do not ordinarily

---

[2]      "[*R*]es ipsa loquitur is a doctrine 'of necessity,' not of convenience" and, accordingly, may be used only in cases where direct evidence of the malfunctioning product is unavailable. *Snider v. Wal-Mart Stores, Inc.*, 664 F. App'x 463, 464 (6th Cir. 2016) (quoting *O'Mara v. Pennsylvania R. Co.*, 95 F.2d 762, 763 (6th Cir. 1938)).  Plaintiff represents that the truck he fell from is no longer available for inspection, at least in the condition it was in at the time of the accident.  (Doc. # 104 at 4-5).  Neither Defendant disputes this contention, and neither objects to Plaintiff's use of the *res ipsa loquitur* doctrine on this basis.

collapse under a person's weight.   A jury could accordingly conclude that Guilkey's injuries stemmed from Commercial's negligent workmanship in assembling the truck and/or its unreasonable failure to discover a defect in the tailgate.

Plaintiff's failure-to-detect theory is bolstered by the opinions of Guilkey's engineering expert, Clinton Channell, who noted in a report that the tailgate at issue could collapse one of three ways: "[1] the tailgate itself can buckle under load, [2] the cables or cable anchor points can fail, or [3] the hinge(s) can fail."  (Doc. # 104-9 at 7).  From this analysis, Channell concluded that "[d]uring fabrication assembly of the [service body] and installation of the [service body] to the vehicle chassis, any apparent defects or issues with the tailgate, tailgate anchors, [service body] anchors, and tailgate cables should have been observed."  (*Id.* at 8).  Based on this conclusion, a jury could determine that a reasonably thorough inspection would have uncovered a defect in the tailgate.[3]

Commercial's responses are unpersuasive.   First, Commercial incorrectly maintains that "Guilkey must pinpoint an act or omission of either Omaha['s] or Commercial['s] that caused his injuries in order to invoke his *res ipsa loquitor* [sic] claims." (Doc. # 97 at 10).  In support of this contention, Commercial quotes out of context the statement in *Enlow v. St. Jude Medical, Inc.* that "[a] lack of knowledge as to the cause of the accident does not call for the application of the doctrine [of *res ipsa loquitur*]."  327 F. Supp.2d 738, 741 (W.D. Ky. 2003) (quoting *Cox v. Wilson*, 267 S.W.2d 83, 84 (Ky. 1954)).  *Enlow* and *Cox* merely stand for the proposition that the accident must be of a

---

[3]      Although Omaha Standard has moved separately to strike Channell's opinions as inadmissible, (Doc. # 109), Commercial has not done so.  Commercial instead merely takes issue with Channell's failure to identify a cause of the accident and does not challenge his opinion that any defect in the service body should have been observed.  (Doc. # 97 at 9).

12

kind that "could not have happened if there had not been negligence."[4]  *Id.* (quoting *Cox*, 267 S.W.2d at 84).  These cases do not purport to require a plaintiff invoking *res ipsa loquitur* to affirmatively identify a cause of the accident.  Indeed, such a requirement would appear to be fundamentally at odds with the doctrine itself, which exists precisely because "the court does not know, and cannot find out, what actually happened in the individual case."  *Snider v. Wal-Mart Stores, Inc.*, 664 F. App'x 463, 464 (6th Cir. 2016) (internal quotation marks omitted).  As the court in *Biliter* explained, *res ipsa loquitur* carries with it "a built-in inference of proximate cause, because the very application of the doctrine is predicated on the inference that the accident was *caused* by negligence."  *Biliter*, 413 S.W.2d at 898.

Commercial next points to the fact that it conducted an inspection of the service body after it was installed and argues that this negates the possibility that Commercial was negligent in failing to discover the defect.  (Doc. # 97 at 10).  This argument, too, is unavailing.  As an initial matter, the fact that an inspection was conducted says nothing about the thoroughness of the inspection.  More significantly, Guilkey has presented evidence to suggest that Commercial's inspection was inadequate under the circumstances.  For example, Wyler employee Charles Wendland stated in his deposition that he noticed upon examining the truck Guilkey fell from that one of the tailgate's cables was not properly secured.[5]  (Doc. # 104-6 at 3-4, 6, 10-11).  Wendland even took

---

[4]      Kentucky courts have also identified as an element of *res ipsa loquitur* the exclusive control by the defendant over the instrumentality that caused the injury.  *See Bowers v. Schenley Distillers, Inc.*, 469 S.W.2d 565, 568 (Ky. 1971).  Commercial does not appear to contest Plaintiff's assertion that this element has been satisfied.  (Doc. # 104 at 17).

[5]      Wendland uses the term "wire" rather than "cable," but the Court understands the two terms to be interchangeable in this context.

photographs of the cable attachment and sent them to Commercial.  (*Id.* at 4).  According to Wendland, the truck's purchaser, Bansal Construction, installed a new bolt in order to properly attach the cable.  (*Id.* at 6-7).  Another of Wyler's employees, Eric Jordan, testified that he examined the truck's cables after the accident occurred and noticed that one was bent to the point where it should have been repaired or replaced.  (Doc. # 104-5 at 5, 8).  A reasonable jury could conclude that, had Commercial conducted a reasonable inspection, it would have noticed these flaws in the tailgate.

Because disputes of fact remain as to whether Commercial was negligent in installing the service body and/or inspecting its condition, Commercial's Motion for Summary Judgment on Guilkey's negligence claims is **denied**.

### D.    Omaha Standard's Motion for Summary Judgment on Guilkey's Strict Liability and Negligence Claims

Although Guilkey's strict liability and negligence claims against Commercial may proceed to trial, Plaintiff's claims against Omaha Standard fail because he cannot eliminate Commercial's conduct as an intervening cause of the defect or dangerous condition in the tailgate.  As the manufacturer of the service body, Omaha Standard is strictly liable only if it is shown that it sold the service body in a defective condition. *Worldwide Equip. v. Mullins*, 11 S.W.3d 50, 59 (Ky. Ct. App. 1999).  "[A] seller is not liable when he delivered the product in a safe condition and subsequent mishandling or other causes made it harmful by the time it was consumed."  *Cox v. Gen. Motors Corp.*, 514 S.W.2d 197, 200 (Ky. 1974).  In addition, while Guilkey may rely exclusively upon circumstantial evidence to demonstrate Omaha Standard's liability, that circumstantial evidence "must be sufficient to tilt the balance from 'possibility' to 'probability.'"  *Perkins*, 613 S.W.2d at 857.  "Where an injury may as reasonably be attributed to a cause that will

excuse the defendant as to a cause that will subject it to liability, no recovery can be had." *Siegel*, 501 F. App'x at 405 (quoting *Sutton's Adm'r v. Louisville & N. R. Co.*, 181 S.W. 938, 940 (Ky. 1916)).

For example, in *Midwestern V. W. Corp. v. Ringley*, 503 S.W.2d 745, 746 (Ky. 1973), the car the plaintiff was driving skidded off the road and into a telephone pole. The plaintiff sued the manufacturer of the car, alleging that it had sold the car with a defective brake drum that had caused the car to swerve unexpectedly. *Id.* At trial, though, the plaintiff's experts admitted that a host of factors not attributable to the manufacturer could just as easily have explained the mechanical failure, including water or dirt on the brake lining, improper adjustment of the brake drum, improper tire pressure, or improper alignment. *Id.* at 747. Because it was not more likely than not that the brake drum defect caused the accident, a directed verdict was warranted in favor of the manufacturer. *Id.* at 747-48.

Like the plaintiff in *Ringley*, Guilkey has failed to "tilt the balance from possibility to probability" because he cannot isolate Omaha Standard as the party responsible for creating the defect in the service body. As Omaha Standard points out, Guilkey's injury occurred around three years after the service body left its possession. (Doc. # 96-8 at 5). During those three years, the service body stayed in the parking lot of Commercial's facility, unprotected by the elements. (*Id.* at 3-4). Commercial's representative, Jennifer Campbell, indicated that while in storage, the service body may have been moved periodically with a forklift and stacked on top of other service bodies. (*Id.* at 4-5). The service body was then painted and installed as part of the truck assembly process. This involved lifting the service body with a crane, setting it onto the chassis, bolting and

welding it, and attaching a hitch.  (Doc. # 104-10 at 7).

Despite having the burden to prove causation, Plaintiff presents no contrary evidence tending to show that any defect in the service body existed at the time it left Omaha Standard's possession.  Moreover, Plaintiff equivocates on this point in his briefs. He argues, for instance, that Commercial made "no material alterations that negated Omaha Standard's defect," (Doc. # 115 at 4-5), only to then assert that "[t]he defect occurred at some point in the manufacturing process of the service body when it was under the control of Omaha Standard and/or Commercial," (Doc. # 108 at 20).

Kentucky courts have held that the inference of causation weakens as time passes and as intervening events occur.   In *Cox*, for instance, Kentucky's highest court held that the plaintiffs could not demonstrate that a product defect caused the rear wheel of their vehicle to fall off when the evidence showed that the vehicle had been driven for sixteen months and had undergone numerous modifications since it had been manufactured.  514 S.W.2d at 200; *see also Briner v. Gen. Motors Corp.*, 461 S.W.2d 99, 102 (Ky. 1970).  In the absence of evidence linking Omaha Standard to the defect, and considering the substantial time lapse and Commercial's intervening storage and installation of the service body, a reasonable jury could not conclude on a more-probable-than-not basis that Omaha Standard—as opposed to Commercial—created the defective condition in the tailgate.

This conclusion is amply supported by the Sixth Circuit's decision in *Waterfill v. National Molding Corp.*, 215 F. App'x 402 (6th Cir. 2007).  There, the plaintiff fell from a tree-mounted deer stand and alleged that the safety belt holding him failed.  *Id.* at 403. He sued the manufacturer of the belt's plastic buckle, a component which was

incorporated into the safety belt by a different company. *Id.* at 403. Applying Kentucky law, the Sixth Circuit affirmed the grant of summary judgment in favor of the defendant, holding that no evidence existed to show that the buckle was defective at the time it was sold by the manufacturer. *Id.* at 404-05. The court reasoned that the buckle's malfunction was not itself evidence of a defect in the buckle's construction because it was just as possible that it became defective only after the strap was assembled. *Id.* at 404. The court further explained that the buckle's breaking "only establishes that the buckle, as it existed years after its manufacture and as incorporated into the safety belt, was defective; under this scenario liability may attach to the manufacturer of the safety harness, but not to [the manufacturer of the buckle]." *Id.* at 405.

Perhaps acknowledging the paucity of evidence supporting causation against Omaha Standard, Guilkey argues in the alternative that he need not show a genuine issue as to causation in a case involving multiple alleged tortfeasors. (Doc. # 103 at 11). This argument lacks merit. Guilkey's reliance on *Embs v. Pepsi-Cola Bottling Co.*, 528 S.W.2d 703 (Ky. 1975), in this regard is misplaced. In that case, a bystander who was injured when a soda bottle exploded in a grocery store sued the manufacturer and distributor of the soda bottle under a theory of strict liability. *Id.* In reversing the trial court's grant of a directed verdict for the defendants, the court in *Embs* stated that "[i]n cases involving multiple defendants the better reasoned view places the onus of tracing the defect on the shoulders of the dealers and the manufacturer as a policy matter, seeking to compensate the plaintiff and to require the defendants to fight out the question of responsibility among themselves." *Id.* at 706.

Unlike the manufacturer in *Embs*, who sold a completed product, Omaha Standard manufactured and sold a component part that was subsequently assembled by a different entity. *Id.* at 704. Accordingly, the evidence here, much more so than in *Embs*, permits the possibility that the defect occurred after the product was sold by the manufacturer. In any event, Kentucky courts have held, both before and after *Embs* was decided, that a plaintiff must reasonably eliminate causes of his injuries that would excuse the defendant from liability. *See Perkins*, 613 S.W.2d at 857; *Sutton's Adm'r*, 181 S.W. at 940. As discussed, Guilkey's inability to pinpoint when the defect occurred is dispositive because it leaves open the likelihood that Omaha Standard did not "sell[] any product in a defective condition unreasonably dangerous to the user," a requirement for a finding of strict liability in Kentucky. *Embs*, 528 S.W.2d at 704 (quoting Restatement (Second) of Torts § 402A).

Plaintiff has not met his burden of showing a dispute of material fact on the issue of whether it is probable that Omaha Standard sold a defective product. Thus, Plaintiff has failed to demonstrate causation as a matter of law. For this reason, Omaha Standard's Motion for Summary Judgment on Plaintiff's strict liability and negligence claims is **granted**.

As a final note, this holding is not inconsistent with the Court's denial of summary judgment for Commercial because the seller of a defective product is strictly liable even if the defect is the fault of an earlier manufacturer. *See Dealers Transp. Co. v. Battery Distrib. Co.*, 402 S.W.2d 441, 443, 446-47 (Ky. 1965); Restatement (Second) of Torts § 402A cmt. (f). The seller in this situation must pay damages to the plaintiff; his remedy is to bring a common-law indemnity claim against the party responsible for the defect. *See Siegel*, 501 F. App'x at 403, 405; *see also Penker Constr. Co. v. Finley*, 485 S.W.2d 244,

249 (Ky. 1972).  Thus, although Guilkey is unable to identify exactly when the defect occurred, it is sufficient for purposes of his claims against Commercial that a jury could conclude that the tailgate was defective at the time it was sold by Commercial.  It follows from this conclusion that a reasonable jury could also determine that Commercial was negligent for either improperly assembling the truck or for failing to reasonably inspect it before its distribution to Wyler.

### E.   Defendants' Motions for Summary Judgment on Plaintiff's Remaining Claims

Commercial and Omaha Standard have each also moved for summary judgment on Plaintiff's claims of breach of express warranty, breach of implied warranty of fitness, breach of implied warranty of merchantability, and punitive damages.  (Docs. # 96-1 at 5, 11 and 97 at 10-11).  Plaintiff in response expressly abandons each of these claims. (Docs. # 103 at 15 and 104 at 17).  Accordingly, Defendants' Motions for Summary Judgment as to these claims are **granted**.

### F.   Plaintiff's Motion for Summary Judgment

Plaintiff cross-moves for summary judgment on his strict liability and negligence claims against both Defendants.  (Doc. # 108).  However, because Omaha Standard is entitled to summary judgment on all claims, Plaintiff's Motion for Summary Judgment against Omaha Standard is **denied**.  In addition, for many of the reasons discussed above, there remain disputes of fact regarding the cause of Plaintiff's fall and thus whether the tailgate was defective.  Thus, Plaintiff's Motion for Summary Judgment against Commercial is **denied**.

III.     **CONCLUSION**

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendant Omaha Standard LLC's Motion for Summary Judgment (Doc. # 96) is **GRANTED**;

(2)     Defendant Commercial Truck & Van Equipment, Inc.'s Motion for Summary Judgment (Doc. # 97) is **GRANTED IN PART AND DENIED IN PART**.  Specifically,

(a)     Summary judgment is **granted** on Plaintiff's claims of breach of express warranty (Count II), breach of implied warranty of fitness (Count III), breach of implied warranty of merchantability (Count IV), and punitive damages (Count VI); and

(b)     Summary judgment is **denied** on Plaintiff's claims of strict liability (Count I) and negligence (Count V).

(3)     Plaintiff's Motion for Summary Judgment against Defendants (Doc. # 108) is **DENIED**;

(4)     Defendant Omaha Standard LLC's Motion to Strike (Doc. # 109) is **DENIED AS MOOT**; and

(5)     **Within twenty (20) days** from the date of entry of this Memorandum Opinion and Order, Guilkey and Commercial **shall file a Joint Status Report** setting forth available dates for a Final Pretrial Conference and Jury Trial, and informing whether they would be amenable to a court-facilitated settlement conference on the remaining claims.

This 22nd day of March, 2021.



Signed By:
*David L. Bunning*   DB

**United States District Judge**

J:\DATA\ORDERS\Cov2018\18-50 MOO Granting MSJ in Part.docx